# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued October 7, 2013         Decided January 24, 2014

No. 12-5149

BECKY ROBERTS,
APPELLANT

v.

UNITED STATES OF AMERICA, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:11-cv-00706)

*John B. Wells* argued the cause and filed the briefs for appellant.

*Alexander D. Shoaibi*, Assistant U.S. Attorney, argued the cause for appellees. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: ROGERS, *Circuit Judge*, and WILLIAMS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*: Becky Roberts brought suit in the district court challenging the refusal of the Board for Correction of Naval Records to amend certain of her fitness reports. Specifically, Roberts claimed that her raters violated Navy directives and discriminated against her on the basis of her gender, and that the Board's failure to correct these errors was arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), and deprived her of due process and equal protection, both in violation of the Fifth Amendment to the Constitution of the United States. Discerning no violation of the APA or of the Constitution, the district court entered a summary judgment for the Government, which we now affirm.

## I. Background

Like most employees of the federal government, officers of the United States Navy receive periodic performance evaluations, called "fitness reports," from their superiors. The preparation of these reports was regulated at all times relevant to this case by Bureau of Naval Personnel (Bureau) Instruction 1610.10 (1995), which required that each officer's performance be graded by a superior officer on a scale from 1 (unsatisfactory) to 5 (exemplary) for each of several traits, such as "Tactical Performance" and "Leadership," and to average the scores into an "individual trait average." BUREAU INSTRUCTION 1610.10 at A-8, A-20. The instruction advised that: "For the majority of Navy people, most of the trait grades should be in the 2.0 to 4.0 range," but it did not limit the award of scores. *Id.* The distribution of trait scores could therefore vary substantially from one rater to another.

Presumably in order to limit the effect of this variance, Bureau Instruction 1610.10 also required the rating officer to make one of five recommendations relating to the

subordinate's potential for promotion: "Significant Problems," "Progressing," "Promotable," "Must Promote," or "Early Promote." *Id.* at A-12. The Instruction further advised that the "recommendation should be consistent with the performance trait grades, and may also take into account the difficulty of the assignment and the reporting senior's judgment of the member's likely value to the Navy in the next higher grades." *Id.* The rater's ability to award strong promotion recommendations, unlike his ability to award high trait scores, was strictly limited: In no event could he recommend more than 20% of the officers in the same rank, or "summary group," for "Early Promote;" the combined percentage receiving recommendations of "Early Promote" and "Must Promote" might also be capped, depending upon the rank of the officers in a particular summary group. *Id.*

Roberts, then a Lieutenant Commander, reported to the Office of Naval Intelligence (ONI) in February 1996. In effect at that time was ONI Instruction 1610.2 (1996), which provided "detailed command guidance in the administration of [Bureau Instruction 1610.10] within the ... ONI." ONI INSTRUCTION 1610.2 at 1. Instruction 1610.2 specified that the "promotion recommendation will be based on the individual trait average," *id.* at 4, and set forth a "baseline guide ... to determine promotion recommendations," *id.* at 5:

(1) 3.90 or above – Early Promote
(2) 3.50 to 3.89 – Must Promote
(3) 3.00 to 3.49 – Promotable

*Id.* "For example," the Instruction explained, "if a member's trait average is 3.89, he/she will probably not be recommended for 'early promote.'" *Id.* Due to the upper limit set forth in Bureau Instruction 1610.10, however, "if greater than 20 percent of a summary group falls within the

'early promote' range, those members with lower trait averages may be recommended for 'must promote' instead." *Id.*

In Roberts's first fitness report, for the period ending October 1996, Captain J.R. Bentz gave her a trait average of 4.17 but classified her "Must Promote," one notch below the level available under the "baseline guide" quoted above. In her next fitness report, for the period ending June 1997, the same rating officer gave Roberts a higher trait average (4.33) but a lower recommendation, *viz.*, "Promotable." In his written comments Captain Bentz explained the lower recommendation "in no way reflects a decline in her performance, but a change in the number of officers in the competitive category." This explanation, however, was incorrect; the size of the summary group had not changed. In her third fitness report while at the ONI, for the period ending October 1997, Roberts received a trait average of 3.83 but again was deemed only "Promotable." In her written comments, the rater, Captain J.E. Darrah, noted: "New Reporting Senior. Lower trait mark average does not reflect decline in performance."

In 1999 Roberts appealed her June and October 1997 fitness reports to the Board for Correction of Naval Records, whose function it is to

> determin[e] the existence of error or injustice in the naval records of current and former members of the Navy and Marine Corps [and] make recommendations to the Secretary [of the Navy] or ... take corrective action on the Secretary's behalf when authorized.

32 C.F.R. § 723.2(b). Roberts claimed her June 1997 fitness report was erroneous because, among other reasons, Captain

Bentz gave her a lower recommendation for promotion than the recommendation corresponding to her trait average in ONI Instruction 1610.2. Roberts faulted her October 1997 fitness report because, rather than evaluate each officer on his or her merits, Captain Darrah had decided "to retain all officers in [the] last promotion recommendation block for the brief ... reporting period" July through October 1997.

In 2000 the Board denied Roberts's petition. With respect to the June 1997 report, the Board acknowledged that Captain Bentz's "stated reason for marking [Roberts] 'promotable,' which was a 'change in the number of officers in the competitive category,' appeared" to be incorrect. The Board was not persuaded, however, that Captain Bentz "should have marked [Roberts] above any of the officers who were marked 'must promote'" or that ONI Instruction 1610.2 required him to do so. That Instruction, in the Board's view, merely provided "guidance concerning the relationship between trait average and promotion recommendation; it did not mandate a certain promotion recommendation for a certain range of trait averages." With respect to the October 1997 report, the Board determined there was insufficient evidence to find Captain Darrah had resolved "to retain all officers in their last promotion block." Roberts did not seek review of the Board's decision.

As a result of these two contested fitness reports, Roberts maintains, she was "passed over for Commander on the first selection board to consider her," which occurred in 2001. She was nevertheless promoted to that rank a year later, and for a time received sterling fitness reports. In May 2005, however, Roberts again received a recommendation of "Promotable" despite a trait average of 4.67. According to Roberts, the rater, Captain W.F. Reiske, explained he gave her a lower promotion recommendation because "another officer, a male,

was being screened for a third time by the Commander Sea Screening Board and ... [Reiske] needed to help out 'fellow officers.'" Roberts was passed over for promotion to Captain in 2009 and 2010.

In 2009 Roberts again appealed her June and October 1997 fitness reports to the Board; this time she also challenged her May 2005 report. With respect to the two 1997 reports, Roberts substantially reasserted the claims made in her 1999 petition but she offered some new evidence in support of them. First, she submitted two letters of recommendation from Captain Bentz, dated 2001 and 2004, urging Roberts's advancement and acknowledging his "unfamiliarity with the long term impact of subtle influences of the new fitness reporting system." In addition, she proffered the affidavit of a private investigator she had hired, recounting supportive comments from Roberts's former colleagues and superiors.

With respect to the May 2005 report, Roberts claimed Captain Reiske had discriminated against her on the basis of her gender, citing Reiske's alleged comment that he needed to help out "fellow officers." Roberts argued this was "strong evidence of invidious discrimination since 'fellow' is normally used in the male sense."

The Board denied Roberts's petition. It explained "the evidence submitted was insufficient to establish ... probable material error or injustice," *see* 32 C.F.R. § 723.3(e)(2) ("The Board may deny an application ... if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice"), and that "[i]n this connection, the Board substantially concurred with the ... advisory opinions" it had received from the Navy Offices of Legal Counsel (OLC) and of Equal Opportunity (EOO). The

OLC opined that Roberts had "offered no new and material evidence" to warrant reopening her earlier challenge to her 1997 fitness reports, and there was insufficient evidence to show Captain Reiske "was motivated to mark the [two male] officers" above her "solely based upon their gender." The EOO noted Reiske had "not demonstrated a pattern of gender discrimination."[*]

Roberts brought suit in the district court, claiming the Board's refusal to correct her records deprived her of due process because her 1997 fitness reports did not reflect her entitlement under ONI Instruction 1610.2 to a promotion recommendation matching her trait average, and deprived her of equal protection because her May 2005 fitness report was the product of gender discrimination. *See Roberts v. United States*, 883 F. Supp. 2d 56, 63–66 (D.D.C. 2012). Roberts also claimed the Board's decision was arbitrary and capricious, in violation of the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A), because it merely "rubber stamped" the advisory opinions and because it was unsupported by substantial evidence. *Id.* at 68–69.

The district court rejected Roberts's claims. It first held the Board did not deny her due process because ONI Instruction 1610.2 "simply does not create an entitlement to an 'early promote' recommendation for all members receiving trait averages above 3.90." *Id.* at 65. The court next held Roberts had submitted insufficient evidence to "suggest[] intentional discrimination on the basis of gender." *Id.* at 67. Finally, the court held the Board's decision was neither

---

[*] The Board also received and "substantially concurred with" two other advisory opinions from offices other than the OLC within the Navy Personnel Command.

arbitrary nor capricious because the Board was entitled to "rely on advisory opinions without providing its own detailed analysis of their correctness," *id.* at 70, and because the explanations in the advisory opinions and in the Board's earlier decision in 2000 provided a reasoned basis for the Board's 2009 decision, *id.* at 69–71. The district court therefore entered summary judgment for the Government. *Id.* at 71.

## II. Analysis

We review the district court's grant of summary judgment de novo, which is to say we "review the administrative action directly, according no particular deference to the judgment of the District Court." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 814 (D.C. Cir. 2002). On appeal Roberts again raises her APA, due process, and equal protection claims.

## A. APA Claim

The Secretary of the Navy, acting through the Board for Correction of Naval Records, "may correct any military record ... when the Secretary considers it necessary to correct an error or remove an injustice." 10 U.S.C. § 1552(a)(1); *see also* 32 C.F.R. 723.2(b) (describing function of the Board). The person seeking to correct a record must provide "substantial evidence" in order to overcome the Board's presumption that "public officers," including military officers, "have properly discharged their official duties." 32 C.F.R. § 723.3(e)(2). The Board may deny an application "if it determines that the evidence of record fails to demonstrate the existence of probable material error or injustice." *Id.*

It is the longstanding practice of this court to review a decision of a military corrections board under an "unusually deferential application of the 'arbitrary or capricious' standard" of the APA. *Kreis v. Sec'y of the Air Force*, 866 F.2d 1508, 1514 (1989); *see also Piersall v. Winter*, 435 F.3d 319, 324 (2006); *Cone v. Caldera*, 223 F.3d 789, 793 (2000). Roberts urges us to reject this line of authority where, as here, the decision is of a "personnel" rather than "operational, strategic or tactical" nature; "the mere fact of military context," she argues, "is insufficient to require deference." The deference we recognized in *Kreis* turned, however, not upon the "military context" but upon "the broad grant of discretion" the Congress gave the Secretary in deciding whether to correct a record. 866 F.2d at 1514. "It is simply more difficult to say that the Secretary has acted arbitrarily if he is authorized to act '*when [he] considers it necessary* to correct an error or remove an injustice,' than it is if he is required to act whenever a court determines that certain objective conditions are met, *i.e.*, that there has been an error or injustice." *Id.* (quoting 10 U.S.C. § 1552(a)(1)). In any event, even were we inclined to revisit *Kreis*, we have no "authority to overturn a decision by a prior panel of this Court." *La. Pub. Serv. Comm'n v. FERC*, 522 F.3d 378, 390 (D.C. Cir. 2008). We therefore follow *Kreis* and limit our inquiry to whether the "Secretary's decision making process was deficient, not whether his decision was correct." 866 F.2d at 1511.

In order to pass even this modest scrutiny, the Board "must give a reason that a court can measure ... against the 'arbitrary or capricious' standard of the APA." *Id.* at 1514–15. In its decision, the Board explained its conclusion as follows:

> [T]he Board found that the evidence submitted was insufficient to establish the existence of probable material error or injustice. In this connection, the Board substantially concurred with the comments contained in the advisory opinions.

Roberts argues this explanation is inadequate because the Board "needed to do more than state their agreement with the [a]dvisory opinions." By simply "rubber stamping" the advisory opinions, Roberts argues, the Board was able to ignore important evidence and arguments, including some she had filed in direct response to the advisory opinions.

As an initial matter, we cannot fault the Board for relying upon the advisory opinions it received. The Board is obliged to provide a "reasoned explanation," *Dickson v. Sec'y of Def.*, 68 F.3d 1396, 1404 (D.C. Cir. 1995), but any agency may meet that obligation by referring the reader to "clearly relevant sources other than a formal statement of reasons," *Envtl. Def. Fund, Inc. v. EPA*, 465 F.2d 528, 537 (D.C. Cir. 1972). Indeed, we have looked before to the reasoning of an advisory opinion in upholding a decision of this very Board. *See Mueller v. Winter*, 485 F.3d 1191, 1199 (2007) (affirming reasonableness of the Board's position where it had "substantially concurr[ed]" in the view of the Navy Personnel Command).[*]

---

[*] Although the Board is free to rely upon the reasoning of an advisory opinion, it must still provide sufficient guidance that its "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974); *see also Dickson*, 68 F.3d at 1404–05. The phrase "substantially concur" makes for a dim lantern. In a future case, the Board's "substantial concurrence" with internally inconsistent or conflicting advisory opinions may make it difficult for the court to determine

The advisory opinion of the Navy OLC supplies the bulk of the relevant analysis. The OLC first noted that the Board had previously denied Roberts's 1999 petition to correct her June and October 1997 fitness reports. Because Roberts "offered no new and material evidence that was not previously considered or reasonably available at the time of the prior application," the OLC advised, the Board should deny Roberts's petition with respect to the 1997 fitness reports "as matters previously considered and finally adjudicat[ed] by the Board."

Roberts rightly points out that she did in fact offer new evidence with respect to the June 1997 fitness report, *viz.*, the letters of recommendation from Captain Bentz and the affidavit of her private investigator, Kenneth Lord, recounting his interview with Bentz. Although the OLC opinion did not explicitly address this evidence, it implicitly – and correctly – deemed it immaterial. In June 1997 Bentz recommended 7 of the 13 members of Roberts's summary group for "Early Promote" or "Must Promote," thereby hitting the 50% upper limit for those combined categories. *See* BUREAU INSTRUCTION 1610.10 at A-12 (upper limit based upon the rank of the officers — here, Lieutenant Commander — in the summary group). In order to raise Roberts's recommendation above "Promotable," therefore, Bentz would have had to reduce the recommendation of an officer rated either "Must Promote" or "Early Promote." Because Bentz did not repudiate any of his ratings in his letters of recommendation or in his putative hearsay statement to Mr. Lord, new evidence was immaterial.

the Board's reasoning. On the present record, however, the Board's route is adequately lit.

Although the Board had already addressed the issue in its decision of 2000, the OLC opinion went on to consider Roberts's argument that ONI Instruction 1610.2 entitled her to a higher promotion recommendation in June and October 1997. The OLC explained, consistent with the Board's reasoning in 2000, the Instruction "indicates that the overall trait average should be used as a baseline guide and [is] therefore not required to be determinative and binding." The OLC added, correctly we think, that the trait average could not be determinative of the promotion recommendation because the promotion recommendation, unlike the trait average, is "constrained by the upper limits" in Bureau Instruction 1610.10.

Roberts objects that ONI Instruction 1610.2 states "[t]he promotion recommendation will be based on the individual trait average," ONI INSTRUCTION 1610.2 at 4; the word "will," she argues, means a rater must use only the trait average to set the promotion recommendation as provided in the baseline guide. Nowhere, however, does the Instruction say the promotion recommendation must be based exclusively upon the trait average; to the contrary, it explains the recommendation "should also take into account the difficulty of the assignment and the reporting senior's judgment of the member's likely value to the Navy in the next higher grades." *Id.* at 5. A rater may depart from the baseline guide for either of these reasons and indeed must depart from the baseline guide if more than the allowed percentage of officers in the summary group would otherwise get one of the two highest recommendations. Under this scheme the baseline guide is just that — a guide. It does not entitle an officer to a particular recommendation on the basis of a particular trait average.

The OLC then turned to Roberts's contention that Captain Darrah froze all officers at their previous recommendation levels for the October 1997 fitness report. The OLC advised, consistent with the Board's decision in 2000, that Roberts had failed to present any corroborating evidence and therefore did not meet her burden to "rebut[] the presumption that [Darrah] follow[ed] Navy directives in submitting the fitness report." The OLC's factual premise is undoubtedly correct: Even on appeal, Roberts points to no evidence in the record to support her contention aside from her own affidavit alleging "the new reporting senior [Darrah] stated that she wished to maintain all officers in the same category during the abbreviated reporting period." In effect the OLC advised that an applicant's unsupported allegation of misconduct is insufficient to rebut the presumption of regularity. We cannot say it was unreasonable of the Board to adopt this position.

Finally, the OLC turned to Roberts's argument that her May 2005 fitness report was the product of gender discrimination. The OLC noted Roberts had provided "no corroborating evidence to substantiate her allegation" that Captain Reiske said he was lowering her recommendation to "Promotable" in order to help out "fellow officers." Assuming Reiske did make that comment, however, the OLC advised:

> The term 'fellow officer' in military parlance is gender neutral and refers to both female and male officers. Although the other two officers *may* in fact be male officers, the statement alone does not show by substantial evidence that the reporting senior was motivated to mark the officers as [Early Promote] and [Must Promote] solely based upon their gender.

We see no error in the OLC's analysis. The OLC correctly looked to whether the evidence showed Captain Reiske was motivated by discrimination on the basis of gender. *Cf. Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977) (absent an overtly discriminatory classification, "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause"). Although the word "fellow" may (or may not) mean "a man or boy" when used as a noun, depending upon the context, *see, e.g.*, Exec. Order No. 11,183 § 2(c), 3 C.F.R. 256, 257 (1964–65) ("White House Fellows shall be ... selected by the President without discrimination on the basis of sex"), when used as an adjective it simply means "in the same condition," WEBSTER'S NEW TWENTIETH CENTURY DICTIONARY 673 (2d ed. 1983). Ordinary usage thus supports the OLC's assertion that the term "fellow officer" is not at all indicative of bias on the basis of gender.

The Board also received, and again substantially concurred in, an advisory opinion from the Navy EOO concluding Reiske "had not demonstrated a pattern of gender discrimination." Roberts argues this reference to a "pattern" invokes "the wrong standard for review of gender discrimination," but she misreads the advisory opinion. The EOO did not suggest Roberts was required to show a pattern of gender discrimination by Captain Reiske; rather, it explained the lack of any pattern favoring men over women in his prior recommendations "demonstrated [Reiske's] willingness to recommend an Early Promote ... regardless of gender." A pattern of discriminatory action, in other words, would have been probative evidence of discriminatory intent, but there was no such pattern.

Roberts's final APA argument is that the Board failed to consider other evidence of Captain Reiske's discriminatory intent, including that the "two male officers were rated above the two female officers;" that the two male officers, unlike Roberts, "had not served in a combat area;" and the supportive comments of her colleague, Marine Colonel Francis Cubillo, as recounted by her private investigator. None of this evidence is significant. That two male officers were rated above two female officers goes to disparate impact, which though "not irrelevant" cannot sustain Roberts's assertion of gender discrimination absent some evidence of discriminatory intent. *See Washington v. Davis*, 426 U.S. 229, 242 (1976). That Roberts had more combat experience than her male colleagues does not imply she should have been recommended above them, or that Reiske was motivated by gender discrimination in rating her below them. The reported comments of Colonel Cubillo are hearsay, but even if taken at face value they show simply that Cubillo was of the opinion "Roberts should have been rated the same as both" the male officers. Cubillo did not in any way imply Reiske recommended the male officers ahead of Roberts with discriminatory intent.

In sum, we hold the Board, drawing upon the advisory opinions of the OLC and of the EOO, reasonably determined "the evidence submitted was insufficient to establish the existence of probable material error or injustice." Roberts presented no material evidence to show her June 1997, October 1997, or May 2005 raters erred in giving her the recommendation of "Promotable;" nor was she entitled by ONI Instruction 1610.2 to a higher promotion recommendation based upon her trait average. The decision of the Board was neither arbitrary nor capricious nor unsupported by substantial evidence, in contravention of the APA.

B. Due Process Claim

In order to make out a violation of due process, the plaintiff must show the Government deprived her of a "liberty or property interest" to which she had a "legitimate claim of entitlement," and that "the procedures attendant upon that deprivation were constitutionally [in]sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989). A "cognizable liberty or property interest," *Hettinga v. United States*, 677 F.3d 471, 480 (D.C. Cir. 2012) (per curiam), is essential because "[p]rocess is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement," *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

Roberts claims a violation of procedural due process but has trouble identifying the substantive interest of which she has been deprived. She says she has a "liberty and property interest in a fair evaluation process," but a "fair evaluation process" is still a process, not a substantive interest in liberty or property**.** Roberts says she has a property interest in her "employment" and a liberty interest in her "freedom to practice her chosen profession," but these are not implicated because Roberts remains employed by the Navy. Roberts says she has a property interest in the "additional active duty pay and future retirement pay that she would have received had she been promoted properly," but this additional pay is conditional upon promotion, and "there exists no property or liberty interest in a military promotion *per se*," *Blevins v. Orr*, 721 F.2d 1419, 1422 (D.C. Cir. 1983). Roberts says she has a "protected interest," per ONI Instruction 1610.2, in a promotion recommendation matching her performance average, but as we have seen already, the Instruction creates no such entitlement.

Finally, Roberts claims she was entitled to performance counseling, which she says she did not receive. *See* BUREAU INSTRUCTION 1610.10 at C-1 ("Members will be counseled at the mid-term point of the evaluation period and at the time of receiving the fitness or evaluation report")**]**. The Supreme Court, however, has suggested an entitlement must have "some ascertainable monetary value" in order to "constitute a 'property' interest for purposes of the Due Process Clause," *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 766 (2005) (internal quotation marks omitted), and Roberts has not shown a counseling session between an officer and her superior has any ascertainable monetary value. In any event, there is no indication Roberts ever asked for and was refused performance counseling. Even were we to assume Roberts asked for and was denied counseling, the deprivation would be harmless because the purpose of counseling is to "motivate performance improvement," BUREAU INSTRUCTION 1610.10 at C-2, and Roberts's performance, by her own account, did not decline.

C.  Equal Protection Claim

Roberts also recasts one of her gender discrimination arguments as an argument she was denied equal protection of the laws. Specifically, she claims the decision of Captain Reiske to give a higher recommendation to a "fellow" male officer, and the refusal of the Board to correct that purported error, violated the equal protection component of the Due Process Clause of the Fifth Amendment. We have already considered the substance of this claim in its manifestation under the APA; as we explained there, Roberts has presented insufficient evidence that Reiske acted with discriminatory intent. Roberts's equal protection claim fails for the same reason.

## III.  Conclusion

We hold the Board's denial of Roberts's petition to correct her military records was neither arbitrary nor capricious and that her constitutional challenges are without merit.  Therefore, the judgment of the district court is

*Affirmed.*